151067. This is the second case before the court. The next case before the court is an appeal from a decision of the Patent Trial and Appeal Board. It is Inova Labs v. Inogen, Inc., Case No. 151067. Mr. Meyertens, do you want three minutes for rebuttal? Yes, Your Honor. Okay. You may begin. Eric Meyertens for Inova Labs. We respectfully submit that the Board committed two errors. The first error was not ever considering the combination of Hakenin with the admitted prior error. There is absolutely no consideration of it whatsoever. Did you make an argument to the Board that if Hakenin does not show user control of the potentiometer, that that element of the claim can be found in the so-called admitted prior error? I didn't see such an argument. It wasn't specifically stated in that way, but what was stated was that the combination of Hakenin with the admitted prior error, in view of that combination, it would be obvious to have user selectability in context with the other elements of the claims. So that combination was specifically stated in our briefing before the Board. But I guess here's maybe a slightly different way of saying it. I took your argument to the Board, and tell me if I'm wrong, that that combination argument itself took as a premise that Hakenin showed user control. No, that's not accurate, Your Honor. The argument to the Board was that Hakenin teaches a potentiometer that shows the ability to have selectivity. The argument that we made to the Board was that it's not limited to anybody, and it isn't. There is absolutely nowhere in the reference where it's limited as to who can use it. And we said that because of the computer 100 in Hakenin, that computer is connected up to the system that has the potentiometer, and it's specifically tied together in the patent. And we said that it would be obvious, in view of the Hakenin teaching, which teaches all the apparatus features that you need to practice this invention, it would be obvious, in view of the admitted prior art, to go ahead and have a user, a patient do it, to exchange between night and day modes. It's true that the Hakenin reference does not specifically state you have to have a day mode and you have to have a night mode. Hakenin doesn't say that. But Hakenin does say you can adjust the sensitivity of the potentiometer in order to adjust the inhalation inspiration pressure. But it doesn't talk about user adjustment. It doesn't talk about any limitation whatsoever as to who can do the adjusting. Let me ask you, help me get my mind around exactly what your argument looks like. I take it you agree with your colleagues on the other side that Hakenin is the key issue. Is that correct? Hakenin is a key reference. And, indeed, your general discussion always talks about Hakenin and the AP applied, what is it? Admitted prior art. Admitted prior art. But you don't specify what that is. It's a lump. Okay. No, it's the background section of the 343 patent. That's what it's about. What a prior art patent, in this case, the Hakenin patent, teaches is a question of fact. Do you agree with that? I think it's a matter of law, Your Honor. Really? I don't think you need an expert to tell you what it teaches. I think you can read it. Our case law says that what prior art teaches for purposes of 103 is a question of fact. It's an odd concept because the patent itself, we've always said construing it with a question of law was now the overlay of TEVA, but with respect to what the prior art patent teaches, it's a question of fact. Okay. Well, it says what it says, and there's no dispute with that. Let's assume, I understand you are coming at this as a question of law, but let's assume it's a question of fact. Okay. What is the standard of review that this court should apply to a finding of fact by an administrative agency? It's substantial evidence, Your Honor, I believe. Right. Meaning that on the basis of the record, if reasonable minds could have gone that way. Right. You're facing a situation in which three of the patent trial and appeal board judges agreed that this is the right way to read Hagen. And is it your argument that they are unreasonable minds? No reasonable mind could have come out where they come out. Is that your position? Well, I agree with them to the extent that they say that Hagen does not specifically specify that a user's selectivity. That's all they say. That's the only factual finding, if such can be the case, with respect to Hagen. That's the only thing that they say about Hagen. Well, in fact, don't they go a little farther than that and say that Hagen contemplates that any adjustments would be made in the factory? In other words, that it is an internal to the machinery. That's not true. The board does not state that. That is an expert witness submitted by my esteemed friend. The board does not say that. The board never makes that finding. In fact, the board specifically does not make that finding. All the board says is that, look, we've looked at this reference. We think the primary issue is to whether there's user selectability in Hagen. We can't tell whether there is or not. We don't find it in there. We don't say it's not in there. We just don't find it. And that's all the quote finding is from the board. There is absolutely no teaching within Hagen of this concept of factory only or manufacturing, etc. In fact, if we're going to use declarations, there's a declaration in the record from a man named Bill Wilkinson who actually builds these machines and actually knows how to do this and has done it for many years. And he says that this was absolutely known that you would have the ability to do this. So I think it's a dangerous ground to go into this area where we say, well, we've got one declaration. We have another declaration, neither of which has been deposed, neither of which has shown any testimony. And we're going to use that to change what the reference that was written 25 years ago says. Why can't we just look at the reference and say that the reference says what it says instead of trying to impute things into it? And that reference specifically has, in Figure 8, Figure 8 is tied to all the other embodiments. There's a specific quote in the patent where it ties Figure 8 to all the other embodiments. Figure 8 has the potentiometer in there. Right, but even in Figure 8, it appears that the potentiometer is something that is encapsulated within the machinery. And so what? A potentiometer has a knob on it typically. It's like a TV or a radio. Is a knob on a TV encapsulated within machinery? No. When you talk about something that can be adjusted, it means you can have access to adjust it. It can be adjusted one of two ways. One, it could be like a knob. What is it then, if you're saying that, okay, I can see that Hakenan doesn't specifically teach user selectability. What is it in the prior art that you say fills that gap, teaches that limitation? Yes. The admitted prior art says that at night, people breathe shallower. Because they breathe shallower, they generate less inspiration pressure. And so when you have one of these machines that it turns on and off based on the inspiration pressure, there's a need to adjust it between the daytime and the nighttime. That's what the admitted prior art says. And then you have the Hakenan reference which says, here's a machine that allows you to adjust the inhalation sensitivity. Not you. It allows anybody. It doesn't say that it's done in the factory. It doesn't say it's done in manufacturing. In fact, these machines in Hakenan are contemplated to be used for people with respiratory problems that have different levels of inspiration sensitivities. And because they have different levels of inspiration sensitivities, the logical reading of Hakenan is that it would be done in the field by the people. So now you're going back to saying that Hakenan does disclose. No. I'm saying a logical reading. I think Hakenan just doesn't say it one way or another. And that's the absolute truth. If you want to just read the reference and see what it says, it doesn't limit it. If a reference doesn't limit it. Okay. So you're not – this is the problem. This is where we started with Judge Trenum. So as I understand your argument, it is that Hakenan does teach it and it's the admitted prior art that helps you construe Hakenan to teach it. Hakenan teaches all the apparatus you need. It's got the machine there. But doesn't teach user selectability. It doesn't teach who actually does the selectability. The admitted prior art says, hey, at nighttime, you need to change it from day to night. And so there would be a reason to adjust it. And we're just saying that that's obvious. Okay. What's the practical impact of this for your district court action? I mean, you just didn't get to shortcut it with a re-exam, right? The district court action is stayed. Okay. And there is a claim of infringement against our client for this claim. And so the practical reality is that we believe the claim is invalid. If that is upheld, then the infringement action goes away. Right. But you could still argue invalidity at the district court, could you not? Yes. But as you know, there's both practical and legal obstacles. And anybody who knows, you go before a jury and you argue the same thing that's already been argued before in another court, you've got an uphill battle. So this makes a big difference to our client. So your gamble was that you had a better shot at getting invalidity from the PTAB than you would from the district court. With respect to the printed publications and patents, that's accurate. We have other prior art, which we will allege, but that's true. And by the way, that's why you see a lot of inter-parties proceedings. There's a second step in all this, whatever Haken teaches, and that is what would one of ordinary skill in the art have done with all of that? Is that the question? Yes. What would a person of ordinary skill in the art, when you have a machine that does everything you need to adjust the sensitivity, and you know that the patient at nighttime needs a different sensitivity, what would you do as an ordinary person of the art? Maybe use that machine to change the sensitivity? The PTAB said no. The PTAB considered 11 different arguments. This is one that got lost in the mix. I think they made a mistake, and it happens. Honestly, you have a situation where you have the exact machine before you. If you have that machine, and you know, if you have the admitted prior art, there's a need to adjust under KSR. The person of ordinary skill in the art is not a pom-pom. They have ordinary creativity. A person of ordinary creativity, ordinary skill in the art, would say, hmm, maybe I'll use the machine for the problem that I'm facing, which is the exact same problem that the machine solves. Okay, you're into your rebuttal time. I'll say my rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. We believe that the Board did have substantial evidence to reach a conclusion that the prior art combinations presented by appellant did not disclose the two core claim limitations that we're really disputing here, the user selectability and picking a level, a lower level at least, that's correlated to a patient's state of inactivity and a lower breathing activity. Why doesn't this fall, as your friend on the other side ended with, the KSR concept of what someone would reasonably conclude looking at Haken even if it doesn't teach user selectability? Why isn't the concept of user selectability something that would easily tumble to any person of skill in the art? Well, I think that the Board, number one, addressed that by concluding that Haken not only has insufficient disclosure, but that it does not teach either of the limitations. That's at page 22 in the Board decision. And the argument, if you're going to talk about what the person of skill brings to the table, we have to bring everything to the table, including knowledge about the other prior art. And Haken in himself solves this problem a different way. He points out in his patent that he uses an auto-fire mode. So if the patient has not had a breath for a certain amount of time, the system will, based on a timer, automatically deliver a breath. And he explains in his declaration at paragraph 13 that that auto-firing is his solution. The so-called admitted prior art in the background explains other ways to address this problem than the prior art. Continuous flow of oxygen to the patient. An apnea alarm, which would sound off and wake the patient if they had not taken a breath in a certain amount of time. So what the person of skill in the art would be taught from the art as a whole is that the direction is to give the respiration apparatus, give the system an override capability to deal with a situation where a patient is having a shallower breath and for some reason the system isn't delivering the breath. Where we disagree with the appellant and where the board came down on our side as well is that somehow that alleged admitted prior art, which identifies the physiological fact that your breathing pattern may change at a lower activity level. At sleep your breathing pattern is shallower. And to leap from that to saying because of that physiological phenomenon, which persons of skill in the art had known about for many years and had chosen to address in the systems completely different ways, again giving the system more control, not giving the control to the user. As I see the basic difference between the prior art taken as a whole and your invention, if I understand it correctly, is that you made the shift from having the adjustment process handled by the professionals in the field or in the manufacturer or whenever to suddenly making it available to the patient to make those adjustments. Correct. Is that the essential inventive step, if we can use that phrase? I would agree, Your Honor, and even expand upon that. If Your Honor's question continues, the way I would expand upon it also is to say that in some situations the way that was being adjusted by professionals, this triggering level, threshold level being adjusted by professionals, was to tune the system to be to a particular level as opposed to then this other concept is now we're going to, rather than pick a single optimized, standardized level where now we can use that to base our strategy for the rest of the respiratory therapy and the rest of the parameters that the clinician might be controlling. We're now giving a lower level to the patient when the patient's inactive and potentially other levels depending on which claim we're in. Claim 1 specifies the lower level. Claim 2 specifies more levels and so on. So we're not only moving who does the adjustment, but we're coming up with this idea of multiple levels that you can return to as opposed to just simply calibrating and fine-tuning. We now have this additional concept. There's an interesting parallel. It used to be that when you were in the hospital having had surgery or some other invasive activity, if you wanted pain relief, you pushed the button on the call button and the nurse or the doctor would come in and determine what your need was and whether it was timely. Nowadays, I understand they give you a little box and you can push the button on the box and the box controls how much you get, but you can self-medicate up to a point, which is essentially the difference, I take it, between the prior art in your case and what you're alleging is the invention here. Is that fair? Your Honor, I think that's an interesting analogy and I think there are definitely some parallels, but I think that the system here that we're claiming has a few more moving parts, if you will, in that there are other issues to be set, just simply besides do I take a dose and whether that dose happens to be delivered intravenously to the patient in your Honor's analogy or whether it's the patient choosing to swallow a pill, perhaps. I think there are fewer variables, fewer therapeutic or clinical variables involved compared to the respiratory apparatus that we're claiming, but the general direction of patient control, that is absolutely something that we're doing. But why isn't, in light of all these other moves in that direction, why isn't this whole thing, remember the second step, whatever Hackenden teaches, why wouldn't someone of ordinary skill in the art have wanted to do this and have seen the need and have said, oh, that seems like a sensible thing to do. Common sense sort of thing. Correct. And to begin with, the way the prior art combinations were phrased and the way the arguments were presented at the Board, it was simply Hackenden plus the admitted prior art and no references to the kinds of user-controlled drug delivery system that your Honor is talking about. But again, I think that when we add in the fact that the purpose, that the fine-tuned calibration in Hackenden was being used for, and this is something that all of the declarants. Did the Board address the contention that Hackenden is silent about who uses the potentiometer? The admitted prior art, and I gather this is now undisputed, discloses that levels of delivery might be usefully changed between night and day because you breathe differently and that it is obvious from that combination that the patient can be one of the people to use the potentiometer. Your Honor, let me start with the middle point in your question that set up the conclusion, the middle point being, are we admitting that the alleged admitted prior art says change the threshold pressure levels? No. No. I'm sorry if I didn't mean to say that. The admitted prior art, and I think you said earlier, it was well known that people breathe differently at night from the way they breathe during the day. So that, you have that, and it could be even confirmed in the admitted prior art. At page A463, Inovum made an argument quite like this. So my first question is, did the Board address it? I don't believe the Board expressly refers to the APA in its decision. However, I submit that the APA really adds nothing above and beyond what we can tell from the Hackanen reference itself, namely that we... Well, then maybe there are two things the Board didn't address. It didn't address the question of motivation of a reader of Hackanen to have the patient be one of the people who would use the knob, the potentiometer, or same motivation drawn from the admitted prior art teaching that people need different levels of the oxygen at night than what they need during the day. Your Honor, the reason I wouldn't go that far is because at the Board level, the focus of the dispute on this issue was largely about the declarations that had been submitted. We had a declaration from Hackanen, the inventor, from Wenzel, an expert, from Mr. Taylor, the inventor and founder, and also from the appellant had a declarant. But the appellant's argument at the Board was that all of our declarations should be disregarded. They were improper in format, effectively inadmissible, as opposed to being relevant to this very issue of knowing about Hackanen having disclosed an adjustable potentiometer for what it discloses, what does it disclose. I'm taking as a given here the correctness of the Board's finding that Hackanen does not say who uses the thing. It is just silent, which seems to me right, and I'm not sure the Board goes further than that. But it's just silent. That leaves the question, might an ordinary skilled artisan say, okay, it shows me a device, it plainly enables adjustment by somebody, it hasn't said who. There's not a professional machine operator at twilight and dusk and in the morning to change things. Why isn't it obvious that the patient can be somebody who does that? Because I think our declarant established the factual record to the contrary. And I think that the Board, by adopting, by saying... And maybe that would be enough if the Board said something about that. So that's where I started and let me return to. Where did the Board say that notwithstanding the well-known phenomenon that people need to think differently night and day, and a machine that enables adjustment, I haven't said by whom, of the oxygen delivery level, that it's not obvious for the patient to be able to do that? Well, by adopting the declaration and the discussions at A23 and A24, which set forth that very conclusion, Your Honor, is set forth in the Wenzel Declaration that the Board is saying is appropriate to give weight to it. And I think also by saying that Hackanen, the conclusion that we don't agree with the requester, and this is at A22, we don't agree with the requester that Hackanen teaches either of the limitations. And so that teaching is through the eyes of the person of skill and the art who would understand that there's a potentiometer in there. Well, suppose I read the teaching part. I do want to get back to the 23-24. The teaching part is simply saying in the usual scope of prior art, content of prior art, deer, whatever element, whatever, Hackanen does not communicate that idea. The next step is, what might a relevant skilled artisan with whatever Hackanen does communicate, plus other knowledge, think of? And I think that, if we're going to parse the opinion a bit, earlier, the previous paragraph, the board said, there's insufficient disclosure about user selectability. And then it goes further and said, there's no teaching. So I think the teaching refers to not just the express disclosure, but the message that would be understood by the skilled artisan. And again, we have all of these declarations telling us the reason Hackanen allows adjustment is for this fine-tuning in the factory. It's something you don't want to fiddle with afterwards. Right, so the board finds that Hackanen doesn't teach the limitation. Doesn't expressly disclose or teach it. Doesn't disclose the limitation. The admitted prior art might give you some motivation to find another way to do this, but there's nothing in the admitted prior art to combine with. There's nothing to combine with, and I think the admitted prior art says, go in the other direction, make the machine smarter, make it override this situation, and automatically... Isn't the evidence on that, in fact... There's evidence on both sides about that. Your guy Wilkinson, is that his name? Winslow was... Winslow, your guy there, Wilkinson? Correct. But it seems to me that the declarations, they had two declarations, you had one. They basically go opposite ways about what somebody with a Hackanen machine sitting in front of him would think. Did the board resolve that dispute? I believe it did, Your Honor. Where? I think they deserve deference. Well, they resolved it because, number one, Winslow never actually... I'm sorry, Mr. Wilkinson, a talent expert, never actually talked about the motivation. He never actually opined on this very issue. Counsel, here's what the board said in what I think is troubling Judge Taranto. The board says, accordingly, this is the last paragraph of the section dealing with Claim 1 and 3 on page 6 of the appendix. Accordingly, we do not agree with the request that Hackanen features either of the limitations at issue in sole and dependent claims 1 or 8. As such, all of the rejections involving Hackanen are deficient as set forth by the examiner and argued by patent owner. We therefore sustain the examiner's non-adoption of rejections 1 through 6. And that makes it sound like what they dealt with was the specific argument set forth by the examiner and argued by the patent owner. Was that the result in this? Is that how you read that? They don't say anything else about the whole thing because the whole rest of that discussion, which is the only board discussion with regard to Claim 1, beginning on page 5 and over into page 6, is a discussion of what Hackanen reveals. The potentiometer doesn't go either way. They don't say anything either way. But then their conclusion simply is all of the rejections involving Hackanen are deficient as set forth by the examiner and argued by patent owner. We therefore sustain the examiner's non-adoption of rejections 1 through 6. And as Appellant's counsel pointed out, they raised about a dozen different rejections in combination with Hackanen at A448 in their notice of appeal to the board. They tried combining Hackanen in many different ways. So you think this is simply a summary of all of that discussion and argument that had gone on? Correct, Your Honor. Okay. Okay, thank you. Thank you very much, Your Honors. We'll give you your full three minutes for rebuttal since we went over a little bit here. Thank you, Your Honor. No, the board did not address the combination of HACLA with the admitted prior art whatsoever at all. What in the prior art? I mean, I understand what you're saying about the prior art providing a motivation. Right. But what in the prior art are we going to be combining with? I mean, in other words, you still have a limitation that's missing. Exactly. You have the admitted prior art which says that there is a need to change the inspiration pressure at night. Right. So that's a motivation to combine. That is a motivation to use the HACLA device to change the inspiration pressure at night. So you're saying it's a motivation to completely revamp. To just use it. You don't have to revamp it at all. You take the machine as HACLA taught and you change it to change the inspiration pressure at night. To say that the user makes a difference as to patentability is like saying that I'm over here. So guess what? It's prior art and it's invalid. But now I'm the user, so suddenly the patent is valid? That doesn't really make sense. The motivation in the admitted prior art is that there is a need to use this at night. That's the only inventive step that was identified. And it doesn't change the physical structure at all. It doesn't change the physical structure. Or might, I guess, depending on... I mean, Hackingen teaches a potentiometer. It doesn't say one way or the other where the controller for that is. But it has a computer connected to the system that has a potentiometer. And it has software that can be used to adjust therapeutic values. That's what it says. So it's a trivial matter to input a couple steps in there to have a computer change the therapeutic values to change the potentiometer that Hackingen teaches. And the answer to your question is no, they did not teach. The board did not address this. Did not consider it. Did not discuss it. The board did not talk about the motivation at all. And no, the board did not resolve the differences between the declarations. And in fact, the declaration of Bill Wilkinson specifically addresses to a person of learning skill in the art would know that using Hackler's potentiometer to allow the user to adjust inhalation pressures is within the scope of Hackler's disclosure. Was there anything in all of your APA that pointed in the direction of user control rather than control by others? That is, manufacturer or the technicians or anything like that. I don't believe the APA addresses that one way or another. There's nothing in Hackingen then. Hackler does not say who uses it, which means anybody can use it. So, yeah, it means anybody can do it if you think of it. So the question is the one I put to your friend, which is, is the distinction between all of that prior art and their invention captured in that patent, is the distinction of suddenly somebody thought of a way to give the user control? Well, I think that you did accurately say that's the purported adventist step in claim one. The thing is, though, the admitted prior art gives you the motivation to do that. The admitted prior art says, hey, it's different at night versus day. And as you have identified, when you're in a hospital, the patient a lot of times wants to press the button themselves. And that's well known and has been for quite some time. But nobody had thought to do that in this particular context, had they? Well, no one specifically says it, Your Honor. That's the key question. But, yeah, if you want to really get down to the nub of it, here you have a motivation to do that, a teaching of an apparatus that can do it. So it's as if the nurse doing it is not patentable, but the patient doing it is? Is that the test for patentability? I don't think it is. If the prior art was limited, that would be different. But it's not. OK. Your time is up. Cases will be submitted. Thank you. All rise. Thank you. The office will open until tomorrow morning at 10 a.m.